# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 14-931V
### Filed: March 18, 2019

```
* * * * * * * * * * * * * *
LISA JOHNSON,                      *      To Be Published
                                   *
            Petitioner,            *
v.                                 *      Finding of Facts; Onset; Influenza ("Flu")
                                   *      Vaccine; Polymyalgia Rheumatica
SECRETARY OF HEALTH                *      ("PMR")
AND HUMAN SERVICES,                *
                                   *
            Respondent.            *
                                   *
                                   *
* * * * * * * * * * * * * *
```

*Howard Gold, Esq.*, Gold Law Firm, LLC, Wellesley Hills, MA, for petitioner.
*Heather Pearlman, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On October 1, 2014, Lisa Johnson ("petitioner") filed a petition *pro se*, pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleged that as a result of an influenza ("flu") vaccination she received on October 9, 2011, she developed polymyalgia rheumatica ("PMR"). Petition at 1, ECF No. 1.

Respondent submits that the medical records do not support a compensable injury. Additionally, and for purposes of this hearing, respondent submits that onset is an issue making a

---

[1] This Ruling has been designated "to be published," which means I am directing it to be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

temporal association impossible. Rule 4(c) Report ("Resp. Rpt.") at 9 n.7; Respondent's Post-Hearing Brief ("Resp. Br.) at 10-11.

A fact hearing was held on March 26, 2018, during which petitioner testified via videoconferencing.

This Ruling is intended to clarify the onset of petitioner's complaints of PMR and must be given to each expert witness for the purpose of authoring expert reports. In writing their reports, the experts must rely on the factual findings contained in this Ruling.

Upon careful review of all the medical records, medical literature, affidavits and testimony, I find that the contemporaneous medical records and histories provided by petitioner to her medical providers more accurately reflect the timeline of her health events than her affidavits and testimony. Specific factual findings are set forth in detail below. In summary, I find that petitioner's onset of PMR occurred in March of 2012.

## I.      Procedural History

For purposes of the onset hearing, the petition was filed *pro se* on October 1, 2014 and assigned to Special Master Hamilton-Fieldman. *See generally*, Petition, ECF No. 1; Notice of Assignment, ECF No. 3. On December 3, 2014, Howard Gold substituted in as counsel of record for petitioner. ECF No. 8. An Amended Petition ("Am. Pet."), medical records, an affidavit,[3] and a Statement of Completion were filed on March 5, 2015. Petitioner's Exhibits ("Pet. Ex.") 1-6, ECF No. 15; Am. Pet., Statement of Completion, ECF No. 16. The Amended Petition stated, "On or about January 1, 2012, Lisa began to experience muscle fatigue and pain, particularly in the morning." Am. Pet. at 2.

Respondent filed his Rule 4(c) Report on May 28, 2015, stating that this matter was not appropriate for compensation. ECF No. 19. Respondent submitted, "[P]etitioner's symptoms as she described historically while seeking medical treatment began in January-February 2012 at the earliest and may have started in March 2012." Resp. Rpt. at 9 n.7.

During a status conference held on June 3, 2015, petitioner's counsel conceded that the first medical visit after vaccination was on April 30, 2012 but maintained that the onset of petitioner's injury occurred on or about January 1, 2012. Scheduling Order at 1, ECF No. 22. Counsel asked for time to determine if additional documentation of onset existed. *Id.* Respondent submitted that petitioner reported pins and needles sensation and pain in her legs during an October 3, 2011, visit with her physician; therefore, the onset of her symptoms may have pre-dated her vaccination. *Id.* Petitioner was ordered to file an affidavit and/or other supportive information regarding the timing of onset of her alleged injury. *Id.*

Petitioner filed a supplemental affidavit on July 1, 2015 along with additional documentation. Pet. Ex. 7, ECF No. 23.

---

[3] Petitioner's affidavit was filed as Pet. Ex. 2. ECF No. 15.

On August 8, 2015, respondent filed a status report ("Resp. S.R") advising that he had reviewed the additional documents filed by petitioner and his position had not changed. Resp. S.R., ECF No. 24.

This matter was reassigned to me on January 14, 2016. *See* ECF Nos. 31, 32.

An onset hearing took place in Washington, D.C., on March 26, 2018. Following the hearing, petitioner was ordered to produce all blood tests and lab reports performed at her place of employment from July 2009 through and including July 2012; Patient Intake Forms for visits with Dr. McPhillips on October 3, 2011, April 30, 2012 and June 7, 2012; and the New Patient Intake Form for July 11, 2012 and intake form for August 8, 2012 from Dr. Fadi Badlissi. Scheduling Order at 1, ECF No. 61.

On May 25, 2018, petitioner filed a status report ("Pet. S.R.") advising that there were no records of any of the blood tests she performed on herself at her place of employment. Pet. S.R. at 1, ECF No. 62. She further advised that all of Dr. Badlissi's records had been filed as Pet. Ex. 5, and no additional intake forms existed. *Id*. On June 6, 2018, petitioner filed a status report stating that all of Dr. McPhillips' records had been filed as Pet. Ex. 4; no additional intake forms existed. Pet. S.R. at 1, ECF No. 66.

Post-hearing briefs were filed on August 20, 2018 and October 6, 2018, respectively. *See* ECF Nos. 71, 74.

This matter is now ripe for ruling.

## II.    The Factual Record

### A.    Petitioner's History Prior to the Flu Vaccine

Petitioner was born on August 3, 1955. Pet. Ex. 1 at 1. She has been married for forty years and has two sons, Curtis and Brett. Tr. 6-7. Petitioner has a degree in Medical Technology from Lasell College in Newton, Massachusetts, and a post-college certification as a medical administrator. Tr. 8. For the past two years, she has worked as a nursing lab coordinator for an Accelerated Bachelor's Degree in Science and Nursing Program at Northeastern University. Tr. 7. Previously, and at the time of the allegedly causal vaccination, she worked for Diagnostic Laboratory Medicine ("Diagnostic") for nineteen years as a field supervisor, dispatching four phlebotomists into the field for over 400 calls a month. Tr. 7-9. From 2009 to 2013, petitioner received a yearly flu vaccine, including the allegedly causal vaccine, through Sargent and Associates, a subcontractor hired by Diagnostic. Tr. 36, 44-45; Pet. Ex. 3 at 1; Pet. Ex. 4 at 47. She also had received hepatitis B and measles-mumps-rubella vaccinations in the past. Tr. 45; Pet. Ex. 4 at 47.

Petitioner's prior medical history includes antibiotic-induced hepatitis, gastroesophageal reflux disease ("GERD"), Morton's neuroma, osteopenia, and diverticulosis. Tr. 38-39; Pet. Ex. 4 at 2, 8, 15. She has a history of tick bites, one on October 9, 2008, after which she was tested for Lyme disease, and one in May of 2011, for which she was treated prophylactically with antibiotics.

Tr. 38; Pet. Ex. 4 at 1, 19. Petitioner described herself as in excellent health prior to her October 9, 2011 flu vaccine. Tr. 10; Pet. Ex. 2 at 1.

On May 16, 2011, petitioner presented to her primary care physician, Dr. McPhillips, for routine examination. Pet. Ex. 4 at 20. She had been going to Dr. McPhillips for several years and had a "fairly good" relationship with her. Tr. 75-76. Petitioner reported working full time in an area laboratory; her children were older and had graduated from college. Pet. Ex. 4 at 20. She was considering retiring to South Carolina with her husband. *Id*. Dr. McPhillips described petitioner as a 55-year-old woman in excellent health. *Id*. Recommendations for calcium and vitamin D supplements were reviewed and bone density testing and a mammogram were scheduled. *Id*. at 21. The remainder of the record is redacted. *Id*. At hearing, petitioner did not recall taking calcium and vitamin D. Tr. 99-100. She recalled a bone density test being ordered and stated that it was routine. Tr. 100.

In June of 2011, petitioner's husband moved to South Carolina for a job. Tr. 17. They moved out of the home they rented, and petitioner rented a room at a home in Bedford. Tr. 67.

Petitioner next presented to Dr. McPhillips on August 4, 2011, with complaints of post-menopausal spotting. Pet. Ex. 4 at 23. Dr. McPhillips ordered an ultrasound, CBC,[4] and Pap smear. *Id*.

Bone density testing performed on September 16, 2011, was normal at two sites in her left hip, but revealed osteopenia in her spine at L1 through L4. Pet. Ex. 4 at 28-29. I asked petitioner if the bone density testing concentrated on her left hip because she had left hip pain. Tr. 100. She recalled having left hip pain "occasionally," but did not recall if she had left hip pain in May of 2011 or when the last time was that she had left hip pain. Tr. 100-01.

Petitioner presented to Dr. McPhillips on October 3, 2011 with complaints of pins and needles on her left lateral calf on occasion, occasional left lower medial thigh discomfort and occasional pain going from her low back to her left lateral thigh. Pet. Ex. 4 at 31. She did not have weakness or difficulty with stairs or brisk walking. *Id*. She did not have morning stiffness but was stretching in the morning. *Id*. She did not engage in regular exercise. *Id*. Dr. McPhillips noted that petitioner had normal peripheral vasculature; she suggested that an L4/5 nerve root irritation was causing intermittent tingling. *Id*. She recommended regular exercise and stretching. *Id*. If her symptoms increased, further evaluation would be ordered. *Id*. Her active medications on that date included estradiol cream and omeprazole. The remainder of that portion of the record was redacted. *Id*.

Petitioner testified that she had "strange pins and needles feelings in my lower outside and inner leg, thigh," that had been going on for a "short while, but it would have been enough for me

---

[4] A "CBC," or complete blood count, is a series of tests of the peripheral blood, including measurements of red blood cell count, hemoglobin, hematocrit, white blood cell count, and platelet count. The CBC is inexpensive and easily and rapidly performed. It is frequently used as a screening test. *See* MOSBY'S MANUAL OF DIAGNOSTIC AND LABORATORY TESTS 156-57 (Kathleen Desk Pagana & Timothy J. Pagana eds., 6th ed. 2018) [hereinafter MOSBY'S].

to come see her." Tr. 14-15. She recalled that Dr. McPhillips attributed this to "something in the lower back that may have pinched my leg." Tr. 15.

When asked about the back pain, petitioner did not recall where the pain originated from, but thought it was "[s]omething like sciatica." Tr. 71. She could not recall whether she had lower back pain when moving from a sitting to a standing position. Tr. 71. She could not remember whether she had difficulty getting out of bed in the morning. Tr. 73. She could not recall whether she took Advil or other medication for pain. Tr. 72-73. She could not recall being prescribed medication or physical therapy for her back pain at that time. Tr. 101. She recalled being told to exercise, but could not recall what she did for exercise, saying, "I may have walked, I may have done the treadmill, something like that." Tr. 72. She could not recall when the back pain began or when it resolved. Tr. 72. She did not recall any events related to the onset of the back pain. Tr. 102-03. Petitioner agreed that when she saw Dr. McPhillips on August 4, 2011, she did not have back pain; therefore, the pain must have started sometime between August of 2011 and October 3, 2011. Tr. 102.

## B.     Petitioner's History Following the Flu Vaccine

Petitioner received the flu vaccine on October 9, 2011 while at work. Pet. Ex. 3 at 1. Petitioner provided two affidavits in this case, one on March 5, 2015 and one on June 30, 2015. Pet. Ex. 2; Pet. Ex. 7. In her first affidavit, petitioner stated, "Beginning around New Year's 2012 I began to have difficulty getting out of bed in the morning due to muscle fatigue and muscle aches." Pet. Ex. 2 at 1. In her second affidavit, petitioner stated that her symptoms "began no later than Christmas week in 2011" when she "began to have difficulty physically getting out of my bed due to muscle fatigue and muscle aches." Pet. Ex. 7 at 1. At hearing, petitioner testified that she began to experience elbow and hip pain, achy muscles, and difficulty with daily activities during Christmas of 2011 and New Year's of 2012. Tr. 15-16.

Petitioner submitted that between November of 2011 through March of 2012, she was caring for her elderly parents, was unable to take time for her own medical needs and did not appreciate the extent of her illness. Pet. Ex. 7 at 2. More specifically, petitioner explained that between November of 2011 and March of 2012, her father had five hospitalizations due to coronary heart failure, a valve replacement, and aortic stenosis.[5] Tr. 18, 20, 28. She was helping her mother with her chronically-ill father, taking her father to doctor's appointments, and assisting with his in-patient needs. Tr. 19-20, 28. She also did the grocery shopping for her parents and paid the bills. Tr. 51-52. Her mother was 88, and "[s]he was doing okay, but she was frail, and she wasn't quite sure of herself." Tr. 21.

Petitioner stated that they did not celebrate Thanksgiving in 2011 because her father was discharged from the hospital on November 16, 2011. Tr. 50-51. Her father was in the hospital again from December 18 to 22, 2011; she tried to help her mother with Christmas decorating and cooking but felt like she did not have the strength she usually had. Tr. 16-17. "I thought, well,

---

[5] These hospitalizations occurred on Nov. 11-16, 2011; Dec. 18-22, 2011; Jan. 4-9, 2012; Jan. 28-30, 2012; and Feb. 24-29, 2012. Tr. 20; *see generally* Pet. Ex. 7.

okay, I'm doing too much…. But I'm not much of a complainer, so I just said, okay, we're going to see if this works through." Tr. 16-17, 47.

Petitioner testified that around the end of February of 2012, her mother began complaining of confusion and hallucinations and was diagnosed with glioblastoma.[6] Tr. 21-22. She was hospitalized at the same hospital where petitioner's father was being treated. Tr. 22. No treatment was rendered due to her age. Tr. 23. Both of her parents were sent to the same rehabilitation center where they stayed together until her mother's passing at the end of March of 2012. Tr. 23; Pet. Ex. 7 at 2. Her father stayed at the center for about two weeks after her mother's death and was then sent home. Tr. 23-24. At that time, she became her father's full-time caretaker since she was the most available of her siblings. Pet. Ex. 7 at 2. Petitioner stated that visiting nurses and nursing agencies came to the house to care for her father, while she coordinated that care and gave him his medication. Tr. 69. She moved her father to an assisted living facility around the end of summer of 2012 and his house was sold. Tr. 91-92.

In her affidavit, petitioner stated by February of 2012, she was living at her parents' home while her husband was living in South Carolina.[7] Pet. Ex. 7 at 2. At hearing, she testified that between November of 2011 and February of 2012, she "pretty much" moved in with her parents, worked from 5:00 am until 1:30 pm and then went to their home to deal with their needs. Tr. 19, 28-29, 37. She later stated that she did not live with her parents full-time. "I was leaving at night, [and] sleeping where I rented my place." Tr. 68-69. Petitioner ultimately stated that she moved into her parents' house shortly before her mother died in March because her father needed the help. Tr. 67-68.

Petitioner agreed that after her October 9, 2011 flu vaccination, she visited Dr. McPhillips on two occasions, April 30, 2012 and June 7, 2012. Pet. Ex. 2 at 2.

On April 30, 2012, petitioner presented to Dr. McPhillips with elbow and hip pain. Pet. Ex. 4 at 32. Dr. McPhillips' record for that visit reads:

> …[B]ilateral elbow pain right greater than left and bilateral lateral hip pain right greater than left. She feels she is too old to be aching like this. She works on the treadmill several days a week and does not do other exercise…. She has no numbness or tingling he [sic] denies weakness of her extremities. Patient has history of low back pain with radiation to the left but this resolved several months ago.

Pet. Ex. 4 at 32. Dr. McPhillips' assessment was bilateral hip abductor tendinitis/gluteus medius syndrome with no evidence of iliotibial band or trochanteric bursitis. *Id*. An exercise routine to include non-weightbearing activities or elliptical exercise and physical therapy if things were not improving was recommended. *Id*. Petitioner's elbow pain was diagnosed as medial epicondylitis;

---

[6] Glioblastoma is the most malignant type of astrocytoma, one of the most common primary tumors of the brain. Glioblastoma is classified as Grade IV and grows rapidly. *Glioblastoma*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 784 (32 ed. 2012) [hereinafter DORLAND'S].

[7] Petitioner's husband relocated to South Carolina in June or July of 2011 to work for a friend. Tr. 17.

she was directed to sleep with her elbows straight and wrapped in towels, and to avoid resting her elbows on armrests. *Id*. Dr. McPhillips deferred bloodwork for petitioner's next visit which was scheduled for the following month. *Id*. An entry under "Medications" was redacted. *Id*.

At hearing, petitioner was provided with the record for that date and confirmed that it was an accurate description of her complaints at that time but stated she had reported she was "too young to feel like this" not "too old." Tr. 24-26; Pet. Ex. 4 at 32. Petitioner added that she went to see Dr. McPhillips in April of 2012 when she "realized that what I was experiencing had not gone away, and I needed to have it, you know, addressed." Tr. 24.

In her second affidavit, petitioner distinguished her October 2011 complaints of pins and needles from the muscle aches, fatigue and soreness "over many areas of my body" that she experienced following the influenza vaccine." Pet. Ex. 7 at 2. At hearing, she described it as "[S]oreness, as opposed to numbness and tingling. Very sore. Like sore muscles, as if you over exercised." Tr. 70-71. She added that her shoulder, elbow, hip joints and muscles felt very sore since the Christmas/New Year's holiday of 2011. Tr. 24-25. She later described the symptoms in December of 2011, as "more like an insidious feeling of something just creeping up on you, where you—you know something is different, and you're not quite sure what it is." Tr. 98. She then stated that the soreness and achiness around Christmas of 2011 was similar to the soreness and achiness she experienced in April of 2012, "but in a more vague way." The hip pain was similar. Tr. 97. She stated her symptoms in April were "elbow pain that [Dr. McPhillips] attributed to tendonitis." Tr. 24. She added that she felt the worst in the morning, took two Advil in the morning and two at around 1 p.m., and felt better by the afternoon as she moved around. Tr. 27.

The record for April 30, 2012, does not mention aching, morning stiffness, or joint inflammation. Tr. 52. There is no mention of petitioner taking Advil or having difficulty getting out of bed. Tr. 58-59. Petitioner was unable to recall if she was taking Advil at that time. Tr. 75.

The record for April 30, 2012 did not reflect a timeline reported to Dr. McPhillips of when petitioner's complaints began, their duration or their progression. Tr. 77-79. When asked why she did not advise Dr. McPhillips of the duration of her symptoms or when they began, petitioner stated, "I thought she might have some ideas of maybe it was arthritis or something. She—and I do believe she did x-rays of my shoulders." Tr. 77. When it was pointed out that she did not complain in April about her shoulders, only her elbows, petitioner stated that she must have complained about her shoulders in July. Tr. 77. Petitioner stated she told Dr. McPhillips that she "had soreness that had been going on for too long," later specifying, "Four months." Tr. 79-80. The record did not document how long her complaints had persisted. Tr. 79.

Dr. McPhillips' record for April 30, 2012 did not reflect what petitioner was testifying to or how long she had been having problems with her hips and elbows. Petitioner stated that would be information one would typically mention to his or her doctor. Tr. 76, 78. Petitioner stated that she had no reason to believe that Dr. McPhillips did not write down everything that she told her. Tr. 82.

In an effort to reconcile petitioner's testimony with what was contained in the record, she was questioned about her reported use of a treadmill after her October 2011 visit with Dr.

7

McPhillips to determine the onset of petitioner's hip pain, soreness, and achiness as opposed to the calf tingling and lower back pain into her leg. Tr. 73-75. Petitioner stated that "several days a week," during her lunch break, she walked on a treadmill in the building adjoining her office but could not recall how many months or even which months she used the treadmill. Tr. 73-74. "I don't think it lasted long. The facility revoked the privileges."[8] Tr. 87. When asked if she then started walking outside instead, she stated that she does like to walk and to be outside, "so it's possible." Tr. 87-88. I asked petitioner whether she thought walking on the treadmill helped her lower back pain; she could not recall. Tr. 75.

Dr. McPhillips deferred ordering any blood work at the April 30, 2012 appointment. Tr. 53. However, petitioner testified to having performed her own blood work at her place of employment that showed an elevated ESR, which she reported to Dr. McPhillips. Tr. 56-57, 85. She could not recall whether she did the blood work in April, May, or June of 2012. Tr. 55-56, 84. She believed it was in April, knew that an elevated ESR indicated inflammation, and noted "it's probably what prompted me to go" to Dr. McPhillips. Tr. 55-57. The April 30, 2012 medical record did not document any blood work showing an elevated ESR being reported by petitioner. Tr. 58.

Petitioner was questioned about the circumstances in which she performed blood work at her place of employment. She explained "if something was happening," she would have blood drawn and run through the analyzer to have controls for herself. Tr. 83. Other times, a group of employees would be asked to do bloodwork on themselves for use as normal controls. Tr. 83. During her 19 years at the lab, she had blood work done as part of a control group "maybe once a year," but she could not recall what time of year that blood work occurred. Tr. 83-84. Petitioner initially testified that she was unable to obtain the blood work result she performed on herself because "it was off the record. It was not a documented lab report…" but later testified that all blood draws, whether done as part of a control group or at her own behest would be in her personnel file. Tr. 53-54, 84. She stated that over the years, she has had blood drawn at her own insistence five times.[9] Tr. 84-85. Petitioner provided no explanation as to why she had previously requested blood draws for herself.

Petitioner did not return to Dr. McPhillips until June 7, 2012, which was a previously scheduled routine examination. Tr. 30. The record for the June 7, 2012 visit states:

> Arthralgias myalgias- complaining of bilateral hips, shoulders and elbow pain when she awakens in the morning. Feels sore for the first 4 hours of the day. Things got better after taking 2 Advil which he [sic] now takes when she gets up with food. The rest of the day she feels well. Patient took labs on herself where she works –

---

[8] Records from the gym were requested but were not filed.

[9] Records of these blood draws were ordered post-hearing, but none was filed.

sedimentation rate[10] was 35 and CRP[11] was 1.7. Patient denies rash, joint warmth or swelling, fevers, chills, sweats. No change in her energy level. Denies any nail changes or skin changes, denies dry eye or dry mouth. LMP age 52.

Pet. Ex. 4 at 33. Dr. McPhillips further noted that petitioner's mother had passed away in the spring, and petitioner was living with her 88-year-old father, who had chronic congestive heart failure. *Id.* at 33-34. Petitioner was no longer exercising. *Id.* at 33. Her exam was normal. *Id.* at 34, 36. Dr. McPhillips' assessment was "56 year-old woman with increase in myalgias – repeat labs pending. Aske [sic] Rheumatology to see pt for ? connective tissue disease." *Id.* at 34. Another entry was redacted. *Id.*

Petitioner testified that in June of 2012, she told Dr. McPhillips that her elbows, hips, and shoulders felt worse. Tr. 30. Unlike the medical record for the April 30, 2012 visit, the record for June 7, 2012 specifically documented complaints of joint and muscle pain, pain in both hips and shoulders, and morning soreness lasting for about four hours. Tr. 59-60. Petitioner testified that this was the same pain she was experiencing at her April visit with Dr. McPhillips. Tr. 31, 60. Petitioner could not recall when her joint and muscle pain began or when she began having difficulty getting out of bed. Tr. 81. When asked if her symptoms were significantly worse between April 30, 2012 and June 7, 2012, she responded, "I think by the time I saw her, yes." Tr. 90. Petitioner testified that she started to take Advil probably in May or June, "because I saw [Dr.] Badlissi in July." Tr. 81. The record does not reflect any phone calls from petitioner to Dr. McPhillips between April and June of 2012 reporting any changes in her health. Tr. 81. Petitioner stated that her symptoms did not affect her ability to work. Tr. 90. The June record did not contain any timeline of the onset of her symptoms. Tr. 82.

Petitioner testified that on June 7, 2012, she told Dr. McPhillips she had done her own blood work and had an elevated ESR at 35. Tr. 55. The record for June 7, 2012 reflects this information. Tr. 55. When I asked petitioner if she expressed concern to the doctor about the elevated level, she stated, "I knew it indicated inflammation. I knew it indicated a problem." Tr. 85. Petitioner stated she had no recollection "of when those [blood tests] were done," suggesting that there may have been more than the one test performed at her work closer to June of 2012. Tr. 56. According to petitioner, the blood work from June of 2012 was done on her own impetus and not as part of a control group. Tr. 84.

At that appointment, Dr. McPhillips ordered blood work which showed an elevated ESR, low vitamin D, and normal rheumatoid factor and CRP. Tr. 60, 85-86; Pet. Ex. 4 at 37-39. Petitioner tested negative for Lyme disease. Pet. Ex. 4 at 40. Petitioner stated that Dr. McPhillips referred her to a rheumatologist, Dr. Badlissi, for myalgias and possible rheumatoid work up following the June visit. Tr. 31, 86; Pet. Ex. 2 at 2.

---

[10] "Sedimentation rate," also known as "erythrocyte sedimentation rate" or "ESR," is a non-specific test used to detect illnesses associated with acute and chronic infection, inflammation, and tissue necrosis or infarction. *ESR*, MOSBY'S at 199.

[11] "CRP," or C-reactive protein, is a protein used to indicate an inflammatory illness. It is elevated in patients with a bacterial infectious disease, tissue necrosis, or an inflammatory disorder. A positive test result indicates the presence, but not the cause, of the disease. *C-reactive protein*, MOSBY'S at 165-66.

On July 11, 2012, petitioner presented to Dr. Badlissi, a rheumatologist at Harvard Medical Faculty Physicians Musculoskeletal Clinic. Pet. Ex. 5 at 1.  She complained of arthralgias and myalgias for the past five to six months. She noticed soreness and pain in her shoulders, hips and back which gradually got worse. She noticed more pain in the morning with stiffness that lasted for two hours. She reported stiffness when she sat in the car for a long time. She reported being under a lot of stress in her life as her father got ill recently and passed away. *Id.* Dr. Badlissi noted that petitioner's mother had PMR. *Id.* Upon examination, petitioner had normal muscle strength in her upper and lower extremities with no synovitis in her joints. *Id.* at 2. She had proximal muscle tenderness in the shoulder area, but normal abduction on external and internal rotation of both shoulders although associated with pain. *Id.* She had normal range of motion in both hips. *Id.* Her laboratory workup from June 7, 2012 showed an elevated ESR but normal CRP, CBC, creatinine,[12] ALT,[13] low level of hydroxyvitamin D and negative for rheumatoid factor,[14] anti-CCP antibodies,[15] Lyme serologies, and Western blot.[16] *Id.* "She had laboratory workup done locally and her lab prior to that which showed normal CRP and C-reactive protein mildly elevated at 35." *Id.* Dr. Badlissi advised petitioner that her symptoms were consistent with PMR. *Id.* He recommended 10 mg of prednisone, advising that a dramatic response would confirm a diagnosis of PMR. *Id.* After discussing the side effects of prednisone, petitioner opted to delay prednisone and instead try exercise and continue ibuprofen. *Id.*

At hearing, petitioner recalled providing a history to Dr. Badlissi of five to six months. Tr. 33-34. "I would have described sore muscles, difficulty getting up in the morning, soreness throughout the day, something very different about myself. It was unusual." Stiffness getting out of the car would have been incorporated in that. Tr. 86-87. Petitioner added she was uncertain if she told Dr. Badlissi that she had difficulty getting out of bed, but she certainly was having difficulty doing so. Tr. 86. She explained that when she said her symptoms had gradually gotten worse, she meant that the pain and stiffness in her shoulders, elbows, and hips would not go away.

---

[12] Creatinine is a breakdown product of creatine phosphate, which is used in skeletal muscle contraction. *Creatinine*, MOSBY'S at 171. Increased creatinine levels can indicate impaired renal function. *Id.*

[13] ALT stands for "alanine aminotransferase" and is also known as serum glutamic-pyruvic transaminase. *ALT*, MOSBY'S at 36-37. ALT is an enzyme found predominantly in the liver. *Id.* Injury disease affecting the liver will caused elevated ALT levels; therefore, this test is used to help identify liver diseases. *Id.*

[14] Rheumatoid factor ("RF") is a combination of IgM, IgG, and IgA antibodies, which are formed in response to abnormal IgG antibodies. *Rheumatoid factor*, MOSBY'S at 409-10. Tests for RF are directed toward identification of IgM antibodies. *Id.* Approximately 80% of patients with RA have a positive RF, but a negative RF does not exclude a diagnosis of RA. *Id.* at 410.

[15] Anti-CCP antibodies, or anticyclic-citrullinated peptide antibodies, appear early in the course of rheumatoid arthritis and are present in the blood of most patients with disease. *Anticyclic-Citrullinated Peptide Antibody*, MOSBY'S at 64-65. Other autoimmune inflammatory diseases are rarely associated with elevated anti-CCP levels, which makes this test useful in differentiating rheumatoid arthritis from other conditions that can resemble RA, such as PMR. *Id.*

[16] The Western blot assay can specifically identify IgG and IgM antibodies and is used in diagnosing Lyme disease. *Lyme Disease*, MOSBY'S at 313-14.

Tr. 89-90. She estimated that her symptoms became worse in June of 2012. Tr. 90.

When asked if she told Dr. Badlissi about having pain in December of 2011, she stated that he "did lots of testing" but was not a "big conversationalist," which was why she switched doctors.[17] Tr. 62. Petitioner was asked how Dr. Badlissi obtained all the information contained in his record. Tr. 34, 62-63. Petitioner thought she probably filled out a form with her medical history and complaints at Dr. Badlissi's office but then stated she did not recall filling out a form. Tr. 87. She did not recall whether Dr. Badlissi specifically asked when her symptoms began. Tr. 63.

Petitioner explained that the five- to six-month timeframe referred to when she "[f]irst recognized pain that was not going away...where I realized it was a problem. Before that, it was discomfort." Tr. 61-62. She added, "He interprets it as five to six months. I don't know whether that was something that he may have condensed into that time or whether he just did not include the – you know, the beginning of the year." Tr. 62. When asked if she thought the record was inaccurate, she responded, "No, I'm not saying I'm contradicting it, just maybe I'm describing the worst of my symptoms during that time." Tr. 62-63. Petitioner did note that one part of the record from July 11, 2012, was wrong; her mother, not her father, passed away. Tr. 33.

Petitioner was asked about her mother's history of PMR as documented in Dr. Badlissi's record. Tr. 63-64. She stated that her mother was diagnosed with PMR in her late fifties or early sixties and was treated with high doses of steroids for about two years. Tr. 41-42. She had an immediate response to the prednisone. Tr. 43. She recalled her mother saying that her PMR had a rapid onset and she could not get out of bed one morning. Tr. 42. When asked if her mother had complained of morning stiffness, petitioner stated that her mother did not complain. Tr. 42. Petitioner stated it was never determined whether a flu vaccine was related to her mother's PMR. Tr. 103. When asked what other rheumatic diseases there were in her family history as noted in her medical records, petitioner stated she did not know to what that record referred. Tr. 41; Pet. Ex. 5 at 1.

Dr. Badlissi's record highlighted petitioner's hesitancy in taking prednisone when it was offered in July but the next record in August documented a dramatic response to prednisone. Pet. Ex. 5 at 1-2, 4. When asked what made her change her mind, petitioner stated "Because prednisone in a short-term duration is powerful and effective, and I wanted to get rid of that. As far as having something that was attacking my system, I needed something to fight back and it wasn't going to be Advil. And he said by testing with that, you'll – it will determine whether it's PMR." Tr. 64-65.

Petitioner returned to Dr. Badlissi on August 7, 2012 for a follow-up concerning her PMR. Pet. Ex. 5 at 4. She was started on 10 mg of prednisone on July 12, 2012 and reported a 90% improvement in her pain and stiffness within 2-3 days. *Id.* According to Dr. Badlissi, petitioner's positive response to prednisone confirmed the diagnosis of PMR. *Id.* Petitioner had a normal CRP, but a mildly elevated ESR. *Id.* Dr. Badlissi lowered her dosage of prednisone from 10 mg to 9 mg. *Id.*

---

[17] Petitioner began treating with Dr. Zangara, over a year later, on September 27, 2013.

Petitioner returned to Dr. Badlissi on September 12, 2012 for "a clinical diagnosis of polymyalgia rheumatica with negative inflammatory markers." Pet. Ex. 5 at 6. She was noted to be doing well; she denied stiffness or pain in her arms or legs and had been on 9 mg of prednisone since August 8 without any adverse reactions. *Id*. She had normal range of motion in both shoulders, no proximal muscle tenderness in the deltoids, quadriceps, or hamstrings, and no synovitis in her joints. *Id*. Dr. Badlissi ordered a prednisone taper to 8 mg and 7 mg before going down to 6 mg on November 1, 2012. *Id*.

Petitioner continued to treat with Dr. Badlissi over the next year. Her prednisone dosage was adjusted several times and her symptoms varied. *See generally* Pet. Ex. 5.

On September 4, 2013, petitioner presented to Dr. Badlissi for a follow-up; she was not having morning stiffness but complained of achiness in her shoulders and back by the end of the day. Pet. Ex. 5 at 23. Dr. Badlissi documented PMR under good control overall and suggested tapering prednisone from 7 mg to 6 mg. *Id*. Labs for inflammatory markers, ESR, and CRP were ordered and were normal. *Id*. at 23, 25-30.

Petitioner sought a second opinion with Dr. Zangara on September 27, 2013. Petitioner provided a history of good health until early in 2012 when she developed musculoskeletal aches and pains primarily in the pectoral, shoulder, and hip girdle areas, without associated weakness. Pet. Ex. 6 at 5. She reported an elevated ESR, but other serologies as normal. *Id*. She reported being diagnosed with PMR and placed on 10 mg of prednisone in March of 2012. *Id*. Around that time, she had bone density testing which showed low level osteopenia. *Id*. at 6. Petitioner stated that she was seeking a second opinion because of her difficulties in reducing her prednisone dosage. *Id*. at 5. She explained that, over the past year and a half, she had been on various doses of prednisone and had flares secondary to stress. *Id*. She had some discomfort at her current dosage of 7 mg, but no inflammation or synovitis. *Id*. She reported that her mother had PMR. *Id*. at 6. In addition to prednisone, she was taking calcium and vitamin D. *Id*. She saw an ENT for voice change and had a negative exam. *Id*. She denied other conditions and diseases. *Id*.

According to Dr. Zangara, her exam was benign. He agreed with the diagnosis of PMR, noting that elevated CRP and ESR were "classic" for PMR, and her response to prednisone also supported the diagnosis. *Id*. at 6. In Dr. Zangara's opinion, petitioner had no evidence of rheumatoid arthritis or other inflammatory arthropathy. *Id*. He suggested the possibility of steroid sparing use of methotrexate and advised petitioner to undergo bone density testing again due to her long-term use of steroids. *Id*. He suggested that she start a prednisone taper once she felt normal. *Id*. at 7.

Petitioner presented to Dr. McPhillips on October 1, 2013 for an "interval exam." Pet. Ex. 4 at 46. She was noted to have a history of PMR diagnosed in June of 2012 with an ESR of 47, CRP of 2.5, and complaints of arthralgias/myalgias in bilateral hips, shoulders, and elbows. *Id*. She was seen by Dr. Badlissi but was now treating with Dr. Zangara. *Id*. She was on 7 mg of prednisone. *Id*. Dr. McPhillips wrote, "Patient is concerned she may have developed PMR from receiving the flu shot 2 years ago. Reviewed the exceedingly low numbers to be related, i.e. 12 individuals to millions of flu shots provided. Strongly recommended patient get flu shot today." *Id*. Petitioner received a flu shot on that day without event. *Id*. at 48.

I asked petitioner about this discussion with Dr. McPhillips. She could not recall when or why she looked for a correlation between the flu vaccine and PMR. Tr. 92. "It was just something that caught my eye at one point." Tr. 92. She recalled finding a publication that documented ten cases of flu vaccine causing PMR. Tr. 92-93. She printed the publication but did not provide it to Dr. McPhillips. Tr. 92-93. Dr. McPhillips assured her that the numbers were exceedingly low. Tr. 92, 94; Pet. Ex. 4 at 46, 48. Despite her concerns, petitioner admitted that she has had the flu vaccine since October 9, 2011, and "I kept having the flu shot." Tr. 93. Petitioner agreed that she has had flu and PPSV 23[18] vaccines since October of 2011 without event. Tr. 65-66; Pet Ex. 6 at 8-9.

The last medical record filed is for an examination on October 2, 2014. Petitioner was seen by a nurse practitioner, Tarryn Holman, for a routine exam. Pet. Ex. 4 at 58. Petitioner reported minimal shoulder pain and felt "really well." *Id*. Her PMR was stable on low dose prednisone and she was being monitored by Dr. Zangara. *Id*. at 61. The record documented a history of PMR and receipt of a flu vaccine "last year" without event. *Id*. at 58. She was to receive a flu vaccine this year when available. *Id*. Petitioner received a pneumonia vaccine at this visit**.** *Id*. at 61.

### III.   Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" such that they present all relevant information on a patient's health problems. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs*., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.,* 26 Cl. Ct. 537, 543 (1992), *aff'd,* 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is

---

[18] The PPSV 23 vaccine is the polyvalent pneumococcal vaccine. DORLAND'S at 1506.

considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

## IV.    Discussion and Findings of Fact

Petitioner alleges that she suffers from PMR as the result of a flu vaccine she received on October 9, 2011.

PMR "is an inflammatory condition of unknown cause characterized by aching and morning stiffness in the cervical region and shoulder and pelvic girdles. It usually responds rapidly to low doses of corticosteroids and has a favorable prognosis." Pet. Ex. 8-D at 1.[19] PMR manifests as persistent pain with aching and morning stiffness in the neck, shoulder girdle, and pelvic girdle that lasts at least thirty minutes. *Id.* at 3. The musculoskeletal pain worsens with movement of the affected area and typically interferes with usual daily activities. *Id.* The majority of patients (70 to 95%) experience shoulder pain causing limitations of active and passive range of motion, while 50 to 70% of patients reported hip and neck involvement. *Id.*; *see also* Resp. Ex. C, Tab 4 at 2.[20] Approximately one third of patients experience systemic symptoms including fever, malaise or fatigue, anorexia, and weight loss. Pet. Ex. 8-D at 3. "The diagnosis is usually made within two to three months after the onset of symptoms." *Id.*

Petitioner received the flu vaccine on October 9, 2011. Pet. Ex. 3 at 1. Petitioner's first medical visit following her vaccination was on April 30, 2012. At that time, she presented to Dr. McPhillips with elbow and hip pain. Pet. Ex. 4 at 32. She did not report stiffness in the morning, trouble getting out of bed, or any symptoms ongoing for any length of time. She was purportedly exercising on the treadmill several times a week. *Id.* She affirmed she was taking Advil to alleviate her pain but at hearing testified that she did not take Advil until May or June of 2012. Pet. Ex. 2 at 1; Tr. 81.

Petitioner posits that she did not seek medical care until April 30, 2012 despite being symptomatic since the Christmas/New Year holiday of 2011 because she was busy caring for her elderly parents. This was undoubtedly a very stressful time for petitioner due to her parents' health issues. Tr. 21-22. During this time, petitioner assisted with coordinating health care for her father, but nursing services provided the rest of his care. Tr. 69. Petitioner did not move in with her parents until just prior to her mother's death on March 29, 2012. Tr. 68. Petitioner continued to work full-time and used her lunch break to go to the gym to walk on the treadmill. Tr. 58, 72; Pet. Ex. 4 at 32. Dr. McPhillips' had been petitioner's doctor for years and her office was less than a mile away from where petitioner lived. Tr. 37.

At hearing, petitioner had little independent knowledge or memory of her medical history or any of the events between the time of her flu vaccination on October 9, 2011 and her diagnosis of PMR in July of 2012, unless provided with a copy of her medical records by her counsel. Even then, she would read from the record, adding little to what was contained therein. *See* Tr. 32, 33, 53, 57, 58, 71, 82, 88. Therefore, the medical records were more reliable that petitioner's memory of the events years later.

Further, it is noteworthy that petitioner did not submit any supporting affidavits from family, friends or co-workers. Petitioner initially stated that between December of 2011 and March of 2012, her husband, who had moved to South Carolina in June of 2011 for a job with a friend, would come home and stay at her parents' house with her. She stated she told him about her health issues. Tr. 17, 90. When asked what she told him, she could not remember. Tr. 90. Later, petitioner

---

[19] Carlo Salvarani et al., *Polymyalgia Rheumatica and Giant-Cell Arteritis*, 347 NEJM 4: 261-71 (2002).

[20] C.E. Owen et al., *Recent advances in polymyalgia rheumatica*, 45 INTERN MED J 1102-08 (2015).

testified that her husband did not come for Christmas or New Year's Eve and probably had not been home from March of 2011 until March of 2012, when he came home for her mother's funeral. Tr. 91. She noted that he probably moved back home around the time they had to sell her father's house in the summer of 2012. Tr. 91. Petitioner's husband did not submit an affidavit or testify on petitioner's behalf. Petitioner testified that she has two adult sons but made no mention of them being aware of her health issues. Tr. 6-7, 13. Neither son submitted an affidavit. Petitioner continued to work full-time throughout this timeframe, but no affidavits from co-workers or friends were submitted in support of her claims. Tr. 19.

Petitioner's medical records and testimony support that when she thought something was wrong with her health, she went to the doctor or otherwise addressed it. In May of 2011, she presented to Dr. McPhillips following a tick bite, with tick in hand. Tr. 38; Pet. Ex. 4 at 19. In August of 2011, she presented with two weeks of gynecological issues. Pet. Ex. 4 at 23. On October 3, 2011, she presented with onset of back pain radiating into the left leg and pins and needles in her calf. *Id*. at 31. Though the record documented her complaints as "occasional," she testified that what she was experiencing was for a "short while, but it would have been enough for me to come see her." Pet. Ex. 4 at 31; Tr. 14-15. Petitioner was unable to provide independent recollection of any events surrounding the onset of her back pain, thigh pain, and pins and needles in her calves, how or if she treated these symptoms, or when her symptoms resolved. Without the medical record to read, she was unable to provide any independent details. *See* Tr. 53, 57, 58, 64, 79, 82, 102.

Petitioner affirmed and testified to difficulty getting out of bed in the morning due to muscle fatigue and achiness around Christmas or New Year's Eve of 2011. Pet. Ex. 2 at 1; Pet. Ex. 7 at 1. She explained that she had muscle soreness, as if she over-exercised, in December. Tr. 70-71. Later she stated it was "more like an insidious feeling of something just creeping up on you, where you – you know something is different, and you're not quite sure what it is." Tr. 98. These symptoms were similar to those in April. She felt the worst in the morning, would take Advil and feel better by the afternoon. Tr. 97, 27.

However, when petitioner presented to Dr. McPhillips on April 30, 2012, after she "realized that what I was experiencing had not gone away, and I needed to have it, you know, addressed," she never mentioned any of these symptoms, or that she had ongoing symptoms since Christmas or New Year's Eve that were getting worse. She reported only bilateral elbow pain right greater than left and bilateral hip pain, right greater than left. Pet. Ex. 4 at 32. She did report being too young to feel like this. *Id*.; Tr. 26. She agreed that all of the symptoms she had testified to would be information one would mention to his or her physician. Tr. 76, 78. However, she did not.

Petitioner acknowledged that she did not contact Dr. McPhillips between April of 2012 and her next regularly scheduled visit on June 7, 2012 with any complaints of progressing symptoms. Tr. 30.

At the June 7, 2012 visit, petitioner reported arthralgias myalgias, bilateral hip pain, shoulder pain, and elbow pain upon waking in the morning which took four hours to go away after taking Advil. She reported having done blood work on herself showing elevated ESR levels. Pet. Ex. 4 at 33. Petitioner agreed that the June 7, 2012 visit documented all of the symptoms that were later diagnosed as PMR. Tr. 59-60. She also conceded that she did not start taking Advil until May

16

or June. Tr. 81. She agreed that she did not tell the doctor how long her symptoms had persisted. Tr. 82. When questioned, petitioner could not recall when the joint and muscle pain began or when she began having difficulty getting out of bed. Tr. 81. She agreed that her symptoms were significantly worse in June. Tr. 90.

Petitioner testified that she performed blood work on herself at her place of employment which showed an elevated ESR and prompted her presentation to Dr. McPhillips in April of 2012. Tr. 56-57. She explained that she had previously done blood work on herself while at work on five prior occasions. Tr. 84-85. She stated that the blood work done at her lab, whether by her own choice or as part of a control group, was part of her personnel record, but she was unable to produce any records. Tr. 53-55, 83-84. Though she initially stated that she did blood work in April of 2012 which showed an elevated ESR, she later could not recall doing so, and at her April 30, 2012 visit, she made no mention of having performed blood work on herself, nor did she report an elevated ESR at that visit. Tr. 56-57; Pet. Ex. 4 at 32.

According to petitioner, her symptoms escalated between April and June of 2012. Tr. 90. It appears reasonable that the escalation of her symptoms between April and June prompted her to conduct blood work on herself, which showed the elevated ESR that she reported to Dr. McPhillips in June of 2012. Petitioner testified that she knew an elevated ESR indicated inflammation and "indicated a problem." Tr. 85. Had she performed blood work in April that showed an elevated ESR, she would have undoubtedly been concerned and reported it to Dr. McPhillips in April. Based on the medical records, it is reasonable to conclude that petitioner either did not perform any blood work until just prior to the June 7, 2012 visit with Dr. McPhillips or she did, and the results were normal.

This conclusion is supported by petitioner's detailed account provided to Dr. McPhillips at her June 7, 2012 visit compared to the April visit. It is further supported by the differences in the conclusions reached by Dr. McPhillips at each of the two visits. In April, Dr. McPhillips concluded that petitioner had tendonitis from leaning on her elbows. Pet. Ex. 4 at 32. Dr. McPhillips did not think much of the complaint of bilateral hip pain, presumptively because petitioner had hip pain in the past; thus, she did not order blood work. *Id*. That all changed in June with the details provided by petitioner at that visit including complaints of shoulder and hip pain, difficulty getting out of bed, and an elevated ESR on self-testing. *Id*. at 33. Dr. McPhillips then referred her to a rheumatologist, Dr. Badlissi. *Id*. at 34.

In July of 2012, when petitioner had her initial examination with Dr. Badlissi, she reported five to six months of symptoms. Pet. Ex. 5 at 1. Over a year later, in September of 2013, when she presented to Dr. Zangara for the first time, she reported onset of symptoms in early 2012 with a diagnosis of PMR in March of 2012. Pet. Ex. 6 at 5.

Petitioner is a poor historian with little memory for timeframes or details. By petitioner's own reporting, it appears that March of 2012 was pivotal to petitioner, not only due to the death of her mother, but also as a defining time during which she experienced an onset of symptoms. The medical records confirm that was formally diagnosed with PMR in July of 2012 when she saw Dr. Badlissi, after taking prednisone, with a rapid response within days, which is characteristic of PMR. Pet. Ex. 5 at 2, 4. Petitioner alleged that she saw Dr. McPhillips on April 30, 2012 because

"everything was over" with her mother and she "realized that what [she] was experiencing had not gone away." Tr. 24. It is therefore expected that she would have reported in detail all issues she was having at that time, as well as an elevated ESR, had she done the self-testing at that time. However, at the April appointment, she reported only elbow and hip pain, and nothing more, which implies that petitioner only had elbow and hip pain, and none of the other symptoms complained of in June of 2012. This would be consistent with petitioner's testimony of her approach on October 3, 2011, when she sought medical care for lower back pain radiating into her left leg with pins and needles of the left calf. *See* Pet. Ex. 4 at 31. Her pattern of presenting when she thought there might be a health issue and providing details of that issue is supported by her history of doing so and her medical records. *See id.* at 20 (noting petitioner's presentation to Dr. McPhillips on May 16, 2011, for a routine exam); *id.* at 23 (noting petitioner's presentation to Dr. McPhillips on August 4, 2011, for post-menopausal spotting). Dr. McPhillips documented a diagnosis of PMR in June of 2012 as well.

On the whole, petitioner had little, if any, memory of the facts concerning her medical visits or what her health was without looking at her medical records. Even then, she added little, if anything, that was not already contained in the record. Therefore, petitioner's reporting of her symptoms to her physicians as contained in the contemporaneous medical records are more reliable than her affidavits and testimony. Based on petitioner's contemporaneous medical records and her history of seeking medical care within several weeks of onset of a medical issue, I find that the medical records support an onset of symptoms in March of 2012 which then escalated between April 30 and June 7, 2012, resulting in the ultimate diagnosis of PMR in July of 2012.

## V.    Conclusion

Upon detailed review of the record in its entirety, I find that petitioner's symptoms began in March of 2012. Petitioner has already filed two expert reports from Dr. Gershwin; however, these reports were based on the facts as provided by petitioner in her affidavits. To continue pursuing her claim, petitioner must file an expert report from Dr. Gershwin which relies on the facts as found in this Ruling. Should petitioner's expert base his opinion on facts not substantiated by this Ruling, the expert's report will be disregarded. *See Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

Accordingly, the following is ORDERED:

**By <u>Friday, May 17, 2019</u>, petitioner shall file either an expert report that is based on the onset as found herein, or a status report indicating how she intends to proceed.** Petitioner shall provide a copy of this Onset Ruling to each of her expert witnesses, and her expert(s) shall rely on the timing of onset as I have found it in this Ruling. If petitioner is unable to secure reports from her expert(s) based on the timing of onset as I have found it, she shall file either a motion to dismiss, a joint stipulation for dismissal, or a motion for a ruling on the record, all of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master